UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-------------------------------------------------------------------X

KIMBERLY TRAPANI,

                          Plaintiff,

        -against-

THE FREEPORT PUBLIC SCHOOL DISTRICT, and
GUSTAVE KARAGROSIZ, in his individual and official
capacity,

                          Defendants.

-------------------------------------------------------------------X

**COMPLAINT**

No. 24-3005

**Jury Trial Demanded**

Plaintiff, KIMBERLY TRAPANI, by and through her attorneys, FAMIGHETTI &
WEINICK, PLLC, alleges upon knowledge as to herself and her own actions, and upon
information and belief as to all other matters, as follows:

### JURISDICTION, VENUE, and PRE-CONDITIONS TO SUIT

1. This is a civil action based on Defendants' violations of Plaintiff's rights guaranteed to
   her by the Fourteenth Amendment of the United States Constitution (as enforced by 42
   U.S.C. § 1983 ("Section 1983")), the New York State Human Rights Law, and any other
   cause of action which can be inferred from the facts set forth herein.

2. Plaintiff intends to amend this Complaint to include claims arising under Title VII, upon
   the EEOC's issuance of a right to sue letter.

3. Jurisdiction of the Court is invoked pursuant to 28 U.S.C. §§ 1331, 1343. Supplemental
   jurisdiction is invoked over State and local causes of action pursuant to 28 U.S.C. § 1367.

4. Venue is proper pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to this action, including the unlawful employment practices alleged herein, occurred in this district and in Nassau County.

5. On May 11, 2023, Plaintiff, via counsel, sent to the Freeport School District an intent to sue letter which set forth, in large part, the allegations and claims alleged herein and notified the Freeport School District of her intent to file suit.

6. On September 7, 2023, the Freeport Public School District agreed to accept service of a Notice of Claim which set forth the claims alleged herein.

7. On September 8, 2023, Plaintiff filed a Charge of Discrimination with the New York State Division of Human Rights (the "Division").

8. The Division cross-filed the Charge with the United States Equal Employment Opportunity Commission (the "EEOC").

9. On November 13, 2023, the Freeport Public School District held a hearing pursuant to N.Y. General Municipal Law § 50-h concerning the Notice of Claim, at which Plaintiff duly appeared and truthfully testified.

10. The Freeport Public School District has since failed and refused to make adjustment or payment.

11. On April 16, 2024, the Division dismissed the Charge of Discrimination on the basis of administrative convenience, thereby allowing Plaintiff to "bring suit as if no complaint had been filed." Ex. 1 (quoting N.Y. EXEC. LAW § 297.9).

12. On April 19, 2024, Plaintiff requested that the EEOC issue a right to sue letter.

13. Accordingly, any and all pre-conditions to suit have been satisfied.

**PARTIES**

14. Trapani is a female, residing in the County of Nassau, State of New York.

15. The Freeport Public School District (the "District") is a municipal school district organized under the laws of the State of New York, with its principal place of business in Nassau County, New York.

16. The District employees hundreds of employees and operates approximately seven public school buildings in the Village of Freeport, New York, for children in grades kindergarten through 12th grade.

17. Gustave Karagrosiz is a resident of the County of Suffolk, State of New York.

**FACTS**

18. On September 1, 2017 the District hired Trapani as a teacher, assigned to the physical education department.

19. Neither at the time of her hire, nor at any time thereafter, did the District instruct Trapani about sexual harassment, or about any policy the District may have promulgated about sexual harassment, despite New York State law requiring employers to conduct such training annually.

20. As a sign of the District's trust in Trapani, and that she performed her job exceedingly well, in June 2021 the District granted Trapani tenure, meaning that the District could not terminate Trapani absent a showing of good cause proven to an independent hearing officer.

21. For the next several years, Trapani continued working in an exemplary manner, receiving strong evaluations, while maintaining a clean disciplinary record.

22. Trapani also worked well with co-workers and supervisors.

23. In September 2022, Freeport hired Karagrozis, a male.

24. A perfunctory review of Karagrozis's online social-media presence at the time of hire would have revealed Karagrozis's tendency to post to social media accounts, offensive,

sex-based content.

25. Either by ignoring this evidence or failing to investigate it, the District nonetheless hired Karagrozis.

26. Further, at the time of the hiring process, Karagrosiz had worked for at least three other school districts, and at least four other schools within those districts.

27. Indeed, at the time of his application to the District, Karagrosiz worked for the New York City Department of Education ("NYC DOE").

28. Karagrosiz's hiring file does not reflect that any individual involved in his hiring decision asked Karagrosiz about the circumstances related to his apparent intent to leave the NYC DOE to work for the District.

29. Moreover, members of the hiring committee interviewed a few of Karagrosiz's co-workers, and an acquaintance of Karagrosiz who holds a supervisory position in a public school, but they did not interview any of his past or present work supervisors who could have shared with the District a history of disciplinary or other supervisory level concerns arising from Karagrosiz's work history in public schools.

30. Indeed, the apparent only written letter of recommendation submitted by Karagrosiz to the District was a letter from a physical education teacher who worked with Karagrosiz

for just eight weeks, while Karagrosiz was a student-teacher, in or around 2015.

31. This alone should have raised concerns in the mind of a reasonably prudent potential employer.

32. For the 2022 school year, the District assigned Trapani to a fifth grade class.

33. Though Karagrozis was slated to teach a sixth grade class, the District reassigned Trapani to co-teach with Karagrozis.

34. Principal Daniel Reardon told Trapani that the District decided to place him with her because, "he had a lot of energy," and the District thought Trapani could "handle him" more effectively than the originally proposed sixth grade teacher.

35. In other words, immediately upon his hire, the District knew that Karagrozis could be problematic and required strong supervision.

36. As Trapani and Karagrozis began working together, they initially engaged in the normal and typical banter that co-workers might be expected to engage in, though Trapani immediately noticed some unusual behaviors from Karagrozis.

37. For instance, Trapani and Karagrozis spoke about their work histories and Trapani learned about Karagrozis's work with the NYC DOE.

38. Trapani inquired about the nature of his separation from the NYC DOE, but learned from Karagrozis only that he hated his former female principal because she was a "cunt," and that she had accused him of stealing information from her and selling it on a teaching website.

39. Because Karagrosiz and Trapani were to be close co-workers who shared an office, they exchanged phone numbers, Trapani believing she was doing so for work related purposes, such as lesson planning.

40. By the end of September 2022, Karagrozis's odd behavior began to manifest in other open and notorious ways.

41. For example, Trapani noticed that Karagrozis was constantly using his cell phone during work hours.

42. Trapani learned that other teachers witnessed Karagrozis using a laptop during dismissal duty to purchase Taylor Swift concert tickets.

43. Additionally, Karagrozis began to use the office he shared with Trapani to perform Yoga exercises in the morning and he would change his clothes in the office and in view of Trapani.

44. Trapani asked Karagrozis to use the gym or the equipment room to exercise, but Karagrozis insisted that the shared office was his "little dojo."

45. Further, Karagrozis bizarrely re-decorated the shared office with candles and strobe lights.

46. Trapani, and others, commented to Reardon about Karagrozis's increasingly unusual conduct, and specifically, that Karagrozis was refusing to exercise anywhere but in their shared office.

47. Reardon responded that Karagrozis was "a little strange," but administrators did not take any action in response.

48. This inaction was all more the troubling given Karagrozis's assignment working with young children in vulnerable situations, including the gymnasium where close physical contact may occur, and his assignment to coach a high school female sports team.

49. In other words, Freeport was aware of Karagrozis's behavior, but took no corrective action.

50. Feeling uncomfortable in the shared office while Karagrozis was contorting his body into awkward Yoga positions, Trapani adjusted her work routine.

51. For example, Trapani had traditionally arrived early to work, but then started arriving as close to her start time as possible.

52. Towards the end of October 2022, Karagrozis's improper conduct escalated.

53. By this time, Karagrozis began sending electronic messages to Trapani, and other female Freeport employees.

54. For example, on October 26, 2022, Karagrozis sent to Trapani a video of a man standing in front of a birthday cake which had a drawing of a penis on it.

55. When the video played, it showed the man blowing out the candle, then the penis ejaculated on the man.

56. Also, in October 2022, Karagrosiz told a student that Trapani had a "fat ass."

57. He did so while they were on lunch duty and while in earshot of another teacher who overheard it.

58. Similarly, in another October 2022 incident, Karagrosiz told teacher Ashley Smith that she must "have that good pussy."

59. Smith told Trapani what Karagrosiz had said.

60. In other words, Karagrosiz did not hide his inappropriate conduct.

61. He was open and notorious about it, such that a reasonably prudent employer properly and reasonably supervising its employees would have and should have known about the conduct.

62. On November 16, 2022, Karagrozis sent a series of videos to Trapani in which an apparent father and son spoke about performing sexual acts on the child's mother and other women.

63. Karagrozis sent at least one of these videos while at work.

64. At or around this time, Trapani learned, directly from Karagrozis, that he was the subject of a complaint arising from his employment with the NYC DOE.

65. Specifically, Karagrozis told Trapani that a co-worker filed a "harassment" case against him.

66. Also, at or around this time, Principal Reardon performed an observation of Karagrozis and Trapani.

67. Later, Trapani spoke with Reardon about the observation.

68. Reardon said that she received a complaint that the physical education teachers were "on their phones."

69. Trapani told Reardon that she assumed the complaint was not related to her because Karagrozis was constantly using his phone while at work.

70. During a follow up conversation about Karagrozis's phone usage during work hours and his inappropriate behaviors, Reardon told Trapani to "take control."

71. Through November, Trapani learned that Karagrozis's disgusting behavior was widespread and unhinged.

72. Co-worker Emily Hertzberg told Trapani that while she was stretching her neck, Karagrozis said, "don't do that you're turning me on."

73. Karagrozis also sent Hertzberg obscene messages, and took pictures of her while she was teaching.

74. By December 2022, Karagrosiz complained to Principal Reardon about Karagrosiz's sex based conduct directed towards her and others.

75. Reardon and the District did not take any corrective action.

76. Through the winter and into the spring of 2023, Karagrozis continued sending electronic messages to Trapani.

77. A summary of some, but not all of those messages, is as follows:

   a. A video entitled "When he can't find the hamper, but he can find the clitoris," accompanied by graphic sexual images;

   b. Additional multiple videos of a man and son talking about sexual conduct;

   c. A video entitled "Life is like a penis," further stating that "sometimes it's up, sometimes it's down, it's not going to be hard forever, so just ride it out";

   d. A video which stated, among other things, that masturbating six times per day increases life expectancy;

   e. A video entitled "A guy showing pictures, one being his dick," with accompanying graphic sexual images;

   f. A meme about penis size;

   g. A video surveying men about oral sex.

78. In addition, through the same time period, Karagrozis's improper conduct in the workplace continued unabated.

79. Again, an incomplete summary of such conduct includes:

a. During what seemed like a "normal" conversation between Karagrozis and Trapani, she asked him if he had ever traveled to Florida, because she wanted to. He responded that he drove to Florida once with his ex-girlfriend, who he made pull over so that he could have sex with her in a parking lot;

b. Karagrozis told Trapani's co-worker that "Kim has a fat ass";

c. While working in their shared office, Karagrozis played a video on his phone which included a woman moaning in a sexual manner;

d. On Trapani's birthday, she arrived in the morning to find a birthday card on her desk. The front of the card stated, "I have to tell you something." When she opened the card, a penis popped out with words on it stating, "eat a dick."

80. Karagrozis's conduct reached its crescendo in April 2023.

81. On April 6, 2023, Trapani and her family, including her two year old son, spent the day together at White Post Farms, a children's farm in Melville.

82. Trapani took a photo of her son feeding a goat, and posted the photo to her Instagram account.

83. Within moments, Karagrozis published a comment to the post, curiously stating only, "I have the best idea."

84. Soon after, Karagrozis posted again, "done, let me know if you want to see it."

85. Concerned, Trapani text messaged her co-worker and friend Hertzberg, inquiring if she understood what Karagrozis meant by his posts.

86. Hertzberg confirmed that she knew what Karagrozis had done, because he sent her the picture via text message.

87. Before they could discuss it any further, Karagrozis electronically sent a picture to Trapani.

88. Karagrozis had, apparently, taken the picture of Trapani's son, removed the background, and inserted his picture into another picture, in a manner suggesting her son was holding the penis of a naked man, with a woman appearing to watch in shock.

89. The woman is a photograph of Trapani, which Karagrozis had surreptitiously taken of her while she was teaching.

90. Thus, Karagrosiz had used the access he had to Trapani vis-a-vis his employment with the District, to secretly photograph her and then he used that photograph in furtherance of an act of sexual harassment.

91. Trapani spent the remainder of her spring vacation in shock and horror.

92. On April 12, 2023, Trapani emailed administrators concerning a "serious matter involving another staff member."

93. Reardon called Trapani and she explained what Karagrozis had done.

94. Assistant Superintendent Ben Roberts also called Trapani, but she missed his call.

95. Though she promptly called back, he said they would speak on Monday.

96. Allegedly, at a point after Trapani's call with Reardon, administrators instructed Karagrazis not to contact Trapani in any manner.

97. Notwithstanding this instruction, Karagrazis text messaged Trapani "please call me . . . it's urgent."

98. On April 17, 2023, when the school reopened, Trapani met with Roberts and Reardon.

99. Trapani showed them the picture and the ongoing sex based messages Karagrozis had been sending Trapani.

100. Trapani also showed them Karagrozis's most recent text messages to her, sent in violation of the instruction that he not contact her.

101.     Instead of supporting and comforting her, Roberts made Trapani feel as if she were the perpetrator being interrogated.

102.     Later that day, Trapani contacted law enforcement about the picture.

103.     By April 18, 2023, Trapani learned that Karagrozis resigned.

## FIRST CLAIM

### (Sex Discrimination – Hostile Work Environment – Fourteenth Amendment via 42 U.S.C. § 1983)

104.     Defendant, Karagrosiz, acting under color of state law, subjected Trapani to a hostile work environment based on her sex/gender.

105.     Defendant, the District, is liable pursuant to Monell v. Dep't of Social Servs., and the Second Circuit's interpretation and application o f Monell under, among other precedents, Lucente v. County of Suffolk, 980 F.3d 284 (2d Cir. 2020) and Legg v. Ulster County, 979 F.3d 101 (2d Cir. 2020) because of the District's failures, via its supervisors, to discipline or otherwise take corrective action, to prevent Karagrosiz's violations of Trapani's civil rights, and by its failure to train its employees who are responsible for hiring to properly investigate candidates' prior work histories and conduct in other public schools and in public.

## SECOND CLAIM
### (TBD)

106.     TO BE AMENDED TO INCLUDE TITLE VII DISCRIMINATION UPON

RECEIPT OF A RIGHT TO SUE LETTER

## THIRD CLAIM
### (Sex Discrimination – Hostile Work Environment – New York State Human Rights Law)

107.    Defendant, Karagrosiz, aided, abetted, incited, coerced, and/or compelled, and was personally involved in, the discriminatory conduct.

108.    Defendant, the District, is Trapani's employer and is liable for the discriminatory conduct alleged herein.

## FOURTH CLAIM
### (Negligent Hiring/Supervision)

109.    Defendant, the District, breached the duty owed to Trapani to protect her from Karagrosiz's unwelcome abusive sex based conduct.

110.    Such duty arises from, among other sources, NEW YORK LABOR LAW § 201-G.

111.    The District knew or was negligent in not knowing that Karagrosiz posed a threat to teachers, including Trapani.

112.    The District's willful, wanton, grossly negligent and/or negligent act(s) of commission and/or omission, resulted directly and proximately in the damage set forth herein.

## FIFTH CLAIM
### (Negligent Infliction of Emotional District)

113.    The District breached the duty owed to Trapani to ensure her safety and well-

being, resulting directly and proximately in Trapani's injuries, including but not limited to mental and emotional distress.

**WHEREFORE,** Plaintiff demands judgment against Defendants, where applicable, for all compensatory, emotional, physical, and punitive damages (where applicable), lost pay, front pay, overtime pay, loss of benefits, reinstatement, injunctive relief, liquidated damages (where applicable), statutory damages, and any other damages permitted by law.  It is further requested that this Court grant reasonable attorneys' fees and the costs and disbursements of this action and any other relief to which Plaintiff is entitled.  Plaintiff demands a trial by jury.


Dated: Melville, New York
      April 23, 2024

                                   Famighetti & Weinick, PLLC
                                   *Attorneys for Plaintiff*
                                   25 Melville Park Road, Suite 235
                                   Melville, New York 11747
                                   (631) 352-0050

                                   _____/s/_____
                                   Matthew Weinick

**EXHIBIT 1**



**Division of
Human Rights**

NEW YORK STATE
DIVISION OF HUMAN RIGHTS

| | |
|---|---|
| NEW YORK STATE DIVISION OF HUMAN RIGHTS on the Complaint of<br><br>KIMBERLY TRAPANI,<br><br>                           Complainant,<br>           v.<br><br>FREEPORT PUBLIC SCHOOL DISTRICT, GUSTAVE KARAGROZIS,<br>                           Respondents. | DETERMINATION AND ORDER OF DISMISSAL FOR ADMINISTRATIVE CONVENIENCE<br><br>Case No.<br>10229205 |

Federal Charge No. 16GC306126

On 9/8/2023, Kimberly Trapani filed a complaint with the New York State Division of Human Rights ("Division") charging the above-named respondent with an unlawful discriminatory practice relating to employment because of sex, opposed discrimination/retaliation in violation of N.Y. Exec Law, art. 15 ("Human Rights Law").

Pursuant to Section 297.3 of the Human Rights Law, the Division finds that noticing the complaint for hearing would be undesirable and the complaint, therefore, is ordered dismissed on the grounds of administrative convenience for the following reason(s):

The Complainant intends to pursue federal remedies in court, in which forum all the issues concerning the question of discrimination charged can be resolved.

Section 297.9 of the Human Rights Law provides that:

... where the Division has dismissed such complaint on the grounds of the administrative convenience, ... such person shall maintain all rights to bring suit as if no complaint had been filed.

PLEASE TAKE NOTICE that any party to this proceeding may appeal this Determination to the New York State Supreme Court in the County wherein the alleged unlawful discriminatory practice took place by filing directly with such court a Notice of Petition and Petition within sixty (60) days after service of this Determination. A copy of this Notice and

Petition must also be served on all parties including General Counsel, State Division of Human Rights, One Fordham Plaza, 4th Floor, Bronx, New York 10458. DO NOT FILE THE ORIGINAL NOTICE AND PETITION WITH THE STATE DIVISION OF HUMAN RIGHTS.

Your charge was also filed under Title VII of the Civil Rights Act of 1964. Enforcement of the aforementioned law(s) is the responsibility of the U.S. Equal Employment Opportunity Commission (EEOC). You have the right to request a review by EEOC of this action. To secure review, you must request it in writing, within 15 days of your receipt of this letter, by writing to EEOC, New York District Office, 33 Whitehall Street, 5th Floor, New York, New York 10004-2112. Otherwise, EEOC will generally adopt our action in your case.

Dated:       April 16, 2024
             Hempstead, New York

                          STATE DIVISION OF HUMAN RIGHTS


By:          _____
             Froebel Chungata
             Regional Director